IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

UNITED STATES OF AMERICA

v.

MUFID FAWAZ ALKHADER,

Defendant.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Case No.   1:25-CR-00007 (AMN)

GOVERNMENT'S SENTENCING MEMORANDUM

This is a case about scaring, intimidating, and threatening a group of innocent people because of their religious beliefs. On December 7, 2023, just a few hours before the first night Chanukah, but after at least two weeks of planning, the defendant, Mufid Fawaz Alkhader, carrying a loaded shotgun that he had recently illegally purchased, approached the front entrance to Temple Israel Jewish synagogue and fired off two rounds. The defendant knew that there were many people inside of the synagogue and he wanted to scare them, and scare them he did.

The defendant believed that the congregants inside of the synagogue deserved to be scared and threatened due to recent geopolitical events in the Middle East. As the defendant approached the synagogue's front entrance, he planned to use his shotgun to shoot out the synagogue's glass windows and "f--k the place up". Instead of shooting out the synagogue's windows, the defendant fired two rounds into the air, and then once his shotgun jammed, he tried in frustration to pull down the Israeli flag flying in front of the synagogue, and ran off the property yelling "Free Palestine".

Terrified by what appeared to be an active shooter right outside of the synagogue, the congregants, employees, and children inside of Temple Israel immediately went into lock-down. For several minutes the congregants, employees, and children inside of the synagogue hid in their classrooms and office spaces, hoping and praying that whatever sinister person was outside would go away and spare them any harm.

Although the defendant was arrested later in the afternoon on December 7th, and law enforcement soon thereafter deemed the scene to be safe, the fear that the defendant sought to bring about in those inside of Temple Israel has continued in the days, weeks, and months following the incident. As a result of the defendant's violent and unlawful actions, he should be sentenced to a total term of imprisonment of 120[1] months, to be followed by a five-year term of supervised release along with the special conditions recommended by the United States Probation Office in its Presentence Investigation Report ("PSIR") (Dkt. No. 36).

# I

# INTRODUCTION

On February 4, 2025, pursuant to a written plea agreement, the defendant entered guilty pleas to Counts One, Two and Three of Information (25-CR-00007), in violation of 18 U.S.C. §§ 371 and 922(a)(6) (Count One – Conspiracy to Commit an Offense Against the United States); 18

---

[1] As will be explained further in this memorandum, the government agrees with Probation's scoring of the offenses in Counts One & Two. However, the government believes that the Court should (i) depart upward by four levels and increase the Total Offense Level for Counts One & Two from 15 to 19; and/or (ii) vary upward by twelve months from the high end of the advisory guideline range for Counts One & Two as currently scored by Probation (18-24 months of imprisonment), and impose sentences of 36 months imprisonment on each of Counts One & Two, to run concurrently with one another. Additionally, the government recommends that the Court impose a guideline sentence of 84 months of imprisonment on Count Three, to run consecutive to the sentences of imprisonment imposed on Counts One & Two. This yields a total term of imprisonment of 120 months.

U.S.C. §§ 247(a)(2), (d)(3) (Count Two - Obstruction of Free Exercise of Religious Beliefs with a Dangerous Weapon); and 18 U.S.C. 924(c)(1)(A)(ii) (Count Three – Brandishing a Firearm in Furtherance of a Crime of Violence).   The defendant is scheduled to be sentenced on August 12, 2025.

## II

## APPLICABLE STATUTORY AND GUIDELINES PROVISIONS

### 1. Statutory Minimum and Maximum Sentences

**a.** The defendant's conviction for 18 U.S.C. §§ 371 and 922(a)(6) (Count One – Conspiracy to Commit an Offense Against the United States) subjects the defendant to a statutory maximum term of imprisonment of five years, *see* 18 U.S.C. § 371; a term of supervised release of up to three years, *see* 18 U.S.C. § 3583(b)(2); and a maximum fine of $250,000, *see* 18 U.S.C. § 3571.

**b.** The defendant's conviction for 18 U.S.C. §§ 247(a)(2), (d)(3) (Count Two - Obstruction of Free Exercise of Religious Beliefs with a Dangerous Weapon) subjects the defendant to a statutory maximum term of imprisonment of 20 years, *see* 18 U.S.C. § 247(d)(3); a term of supervised release of up to three years, *see* 18 U.S.C. § 3583(b)(2); and a maximum fine of $250,000, *see* 18 U.S.C. § 3571.

    **c.**    The defendant's conviction for 18 U.S.C. 924(c)(1)(A)(ii) (Count Three – Brandishing a Firearm in Furtherance of a Crime of Violence) subjects the defendant to a statutory minimum term of imprisonment of seven years, and a statutory maximum term of imprisonment for life, *see* 18 U.S.C. § 924(c)(1)(A)(ii);[2] a term of supervised release of up to five years, *see* 18 U.S.C. § 3583(b)(1); and a maximum fine of $250,000, *see* 18 U.S.C. § 3571.

    **2.**    **Guidelines Provisions**

    **a.**    **Plea Agreement**

Pursuant to paragraphs 6(a), (b) & (e) of the plea agreement, the parties have entered into the following stipulations: (i) at the time that the defendant committed the offense in Count One, the defendant was a prohibited person, and that pursuant to U.S.S.G. §§ 2X1.1(a) & 2K2.1(a)(6), the base offense level for Count One is 14; (ii) the defendant used and possessed a firearm in connection with another felony offense, and that pursuant to U.S.S.G. § 2K2.1(b)(5)(B), the offense level for Count One should be increased by two levels; and (iii) the defendant intentionally selected any victim or property as the object of the offense in Count Two because of the actual or perceived race and religion of Temple Israel's congregants, and that pursuant to U.S.S.G. § 3A1.1(a), the offense level for Count Two should be increased by three levels.

    **b.**    **Offense Level Calculations**

    **1.)**    **Count One – Conspiracy to Commit an Offense Against the United States**

Under the federal sentencing guidelines, the base offense level for the defendant's conviction for Count One is 14. U.S.S.G. §§ 2X1.1(a) & 2K2.1(a)(6); PSR ¶ 53. That level

---

[2] The term of imprisonment for Count Three must be imposed consecutively to any other term of imprisonment imposed on the defendant, pursuant to 18 U.S.C. § 924(c)(1)(D).

4

should be increased by two levels as a result of the following Chapter Two specific offense characteristics: the defendant used and possessed a firearm in connection with another felony offense.  U.S.S.G. § 2K2.1(b)(5)(B); PSR ¶ 54.

    **2.)     Count Two – Obstruction of Free Exercise of Religious Beliefs with a Dangerous Weapon**

Under the federal sentencing guidelines, the base offense level for the defendant's conviction for Count Two is 10.  U.S.S.G. §§ 2H1.1(a)(3); PSR ¶ 59.  That level should be increased by three levels as a result of the following Chapter Three victim related adjustments.  The evidence establishes beyond a reasonable doubt that the defendant intentionally selected his victims and/or the Temple Israel synagogue because of the actual or perceived religion of the synagogue's congregants, and as such, the offense level should be increased by three levels.  U.S.S.G. § 3A1.1(a); PSR ¶ 60.

    **3.)     Count Three – Brandishing a Firearm in Furtherance of a Crime of Violence**

Under the federal sentencing guidelines, the guideline sentence for Count Three is the term of imprisonment required by statute (seven years).  18 U.S.C. § 924(c)(1)(A)(ii); PSR ¶ 52.

    **4.)     Multiple Count Adjustment for Counts One & Two**

As Counts One and Two do not involve substantially the same harm, they do not group under U.S.S.G. § 3D1.2; PSR ¶ 51.  Count One's Adjusted Offense Level is 16, and Count Two's Adjusted Offense Level is 13.  PSR ¶¶ 58, 63.  The greater of the Adjusted Offense Levels (16) is to be increased by two levels.  U.S.S.G. § 3D1.4; PSR ¶ 66.  The resulting Combined Adjusted Offense Level for Counts One and Two is 18.  U.S.S.G. § 3D1.4; PSR ¶ 67.

    **c.     Acceptance of Responsibility**

The defendant is entitled to a two-level downward adjustment to his offense level for

5

acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a). The government moves for an additional one-level downward adjustment pursuant to U.S.S.G. § 3E1.1(b) to credit the defendant for having "assisted authorities in the investigation and/or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently."

### d. Criminal History Category

According to the presentence report, the defendant's criminal history category is one. PSR ¶ 78. The government agrees with the Probation Office's determination of the defendant's criminal history category.

### e. Guidelines Range and Sentence

Consistent with the calculations in the presentence report, the Total Offense Level for Counts One and Two is 15, and the criminal history category is one. PSR ¶¶ 71, 78.

As a result of the above-described calculations, the sentencing guidelines sections advise that the defendant receive a sentence of imprisonment on Counts One and Two of between 18 and 24 months. PSR ¶ 112. The guideline sentence of imprisonment for Count Three is 84 months, and it must be ordered to run consecutive to any sentence of imprisonment imposed for Counts One and Two. *Id*.

The guidelines call for a term of supervised release on Counts One and Two of between one year and three years. PSR ¶ 118. The guidelines also call for a term of supervised release on Count Three of between two years and five years. *Id*.

The guidelines call for a fine range of $7,500 to $75,000. PSR ¶ 123.

3.  **Government Motions for Upward Departures and/or Arguments for Upward Variances on Counts One and Two**

Based upon the aggravating and exceptional circumstances in this highly unusual case, guideline sentences of imprisonment (18-24 months) on Counts One and Two do not reflect how dangerous and harmful the defendant's crimes were. Imprisonment sentences of 36 months on Counts One and Two, to run concurrently with one another, are necessary to achieve justice in this case.

a.  **Motions for Upward Departures**

An upward departure from the 18-24 months guideline range of imprisonment to 36 months for Counts One and Two is warranted under either of the two Policy Statements to be discussed below, and in the alternative, is also warranted under U.S.S.G. § 5K2.0(c). *See* PSR ¶¶ 130, 132.

1.)  **Policy Statement - Extreme Psychological Injury Under U.S.S.G. § 5K2.3**

Under the Policy Statement for Extreme Psychological Injury (U.S.S.G. § 5K2.3), an upward departure may be warranted when "victims suffered psychological injury much more serious than that normally resulting from commission of the offense . . . [and] there is a substantial impairment of the . . . psychological, emotional, or behavioral functioning of a victim, when the impairment is likely to be of an extended or continuous duration, and when the impairment manifests itself by physical or psychological symptoms or by changes in behavior patterns." *Id*. *See United States v. Lasaga*, 328 F.3d 61, 65-66 (2d Cir. 2003).

In order for a Court to apply § 5K2.3 to justify a departure, a Court must "begin by asking whether the factors set out in the first sentence of paragraph two are met-i.e., whether one of the named areas of functioning is substantially impaired, for a long period of time, and in a symptomatic way-because there is a presumption that the guideline applies only when those factors

are met." *Id*. at 66. If the Court finds that this standard is satisfied, "the court must then also satisfy itself that the basic standard set out in the first sentence of the first paragraph is met: that the injury is 'much more serious than that normally resulting from commission of the offense.' In short, § 5K2.3 requires a finding of comparatively greater harm, relative to a 'normal' or 'typical' injury of the type enumerated in the guideline." *Id*.

The defendant planned to ravage Temple Israel by using his illegally purchased shotgun to blast out the synagogue's glass windows. PSR ¶ 14. Through these acts of calculated violence, the defendant intended to scare the innocent people inside of Temple Israel. PSR ¶ 15. And, to show his further disdain and/or hate for the Jewish people inside of the synagogue, the defendant attempted to pull down the synagogue's flag. PSR ¶ 12. Executing on this plan made severe psychological and emotional harm to the community almost certain.

For many of the victims harmed by the defendant on December 7, 2023, the psychological and emotional harms live on, have caused substantial impairment, and have caused changes in behavior patterns. These harms live on because the victims know that they were targeted because of their faith, and that as long as their faith remains, they feel as though they continue to be targets for violence. *See, e.g.*, Dkt No. 36-1 at pp. 6-7, 8-9, 17-20. Living in a near-constant state of fear and anxiety is unhealthy, but for many of the Temple Israel victims, it is a sad reality that they endure, and one that continues to this day, almost two years after the incident. *Id*. Victims describe recurring feelings of fear, terror, nightmares, and panic (classic symptoms of Post Traumatic Stress Disorder (PTSD)) and how those feelings haunt them when visiting Temple Israel - a Temple that should be a place of peace. *Id*. at pp. 5, 7, 8, 16, 17. The victim impact statements also detail parents taking their children out of the Temple's daycare because of the incident, and

8

victims seeking regular therapy, investing significant resources in security and training for the Temple and its congregants, and avoiding events at the Temple and other Jewish gatherings. *Id*. at pp. 8, 10, 18.

This is not a case in which a person simply tried to deface Temple Israel's synagogue with rotten eggs, or by spray painting hateful words or symbols. Rather, for the unfortunate victims inside of Temple Israel on the afternoon of December 7, 2023, they did not know whether they were going to live or die. *See, e.g.*, Dkt No. 36-1 at pp. 9, 16. Emotions of extreme fear, panic, and helplessness – all caused by the defendant's actions, are well chronicled in the victim impact statements. *See id*.

For Count Two, the sentencing guidelines treat this crime essentially the same as if the defendant had simply vandalized the building or prevented congregants from entering. But the community in this case reasonably feared, and continues to fear, serious harm or death at a location that is important to their faith. This Court should find that this is a "psychological injury much more serious than that normally resulting from commission of the offense." U.S.S.G. § 5K2.3

**2.)    Policy Statement - Dismissed and Uncharged Conduct Under U.S.S.G. § 5K2.21**

Under the Policy Statement for Dismissed and Uncharged Conduct (U.S.S.G. § 5K2.21), an upward departure may be warranted to "reflect the actual seriousness of the offense based on conduct (1) . . . underlying a potential charge not pursued in the case as part of a plea agreement or for any other reason; and (2) that did not enter into the determination of the applicable guideline range." *Id*. This Policy Statement has been used to justify upward departures in other federal courts in this District and elsewhere. *See United States v. Montalvo*, No. 20-4176-CR, 2022 WL 4282145, at *1 (2d Cir. Sept. 16, 2022) (upholding upward variance based on dismissed conduct

9

for discharge of a firearm in relation to a crime of violence or a drug trafficking crime); *see also United States v. Knife*, 2024 WL 764957, at *1 (8th Cir. Feb. 26, 2024) (affirming upward departure and/or variance based on dismissed charge of discharge of a firearm during and in relation to a crime of violence).

In this case, the defendant pled guilty, pursuant to the parties' plea agreement, to Count Three which alleged that the defendant Brandished a Firearm in Furtherance of a Crime of Violence, in violation of 18 U.S.C. § 924(c)(1)(A)(ii). PSR ¶ 1(c). As the PSR correctly notes, this offense carries with it a mandatory minimum sentence of imprisonment of seven years. PSR ¶ 111. Yet, the evidence is clear that on the afternoon of December 7, 2023, as the defendant walked briskly towards the front entrance to Temple Israel, he not only brandished his illegally acquired shotgun, he fired off two rounds (into the air), or in other words, he discharged the shotgun, and had additional rounds on his person. PSR ¶¶ 3(k), 9-10. Had the defendant been charged and found guilty of Discharging a Firearm in Furtherance of a Crime of Violence, in violation of 18 U.S.C. § 924(c)(1)(A)(iii), he would have been facing a mandatory minimum sentence of imprisonment of ten years. The three-year disparity between the two statutory minimum penalties is significant and changes the penalty landscape in the defendant's favor.

**3.) Departures Based Upon Multiple Circumstances Under U.S.S.G. § 5K2.0(c)**

Should the Court find that neither of the two Policy Statements above is independently sufficient to justify an upward departure, the Court can still upwardly depart if it finds that " . . . a combination of two or more . . . other circumstances, none of which independently is sufficient to provide a basis for departure, . . . [show] – (1) such . . . other circumstances, taken together, make the case an exceptional one; and (2) each . . . other circumstance is – (A) present to a substantial

degree; and (B) [is] identified in the guidelines as a permissible ground for departure, even if such . . . other circumstance is not ordinarily relevant to a determination of whether a departure is warranted." U.S.S.G. § 5K2.0(c).

Undoubtedly, this case contains substantial evidence of the permissible grounds for upward departures under Extreme Psychological Injury and Uncharged Conduct. *See* U.S.S.G. §§ 5K2.3 & 5K2.21. Should the Court disagree with the government's argument that either of the Policy Statements, standing alone, justifies an upward departure, the Court can still depart upwards if it finds that taken together the aforementioned grounds make the case an exceptional one. For all of the reasons argued above, and in Part III of this Memorandum, the government believes that the defendant's conduct is exceptionally bad and exceptionally harmful to the victims.

  **b.**   **Arguments for Upward Variances**

Following the United States Supreme Court's decision in *United States v. Booker*, a District Court "may impose either a Guidelines sentence or a non-Guidelines sentence." *See Booker*, 543 U.S. 220, 245-46 (2005); *United States v. Sanchez*, 517 F.3d 651, 660 (2d Cir. 2008). An upward variance of twelve months from the high end of the currently scored 18-24 months guideline range of imprisonment for Counts One and Two is warranted under a totality of the 3353(a) factors. *See, e.g., United States v. Arrelucea-Zamudio*, 581 F.3d 142, 149 (3d Cir. 2009) (holding that a District Court "has the discretion to consider a variance under the totality of the § 3553(a) factors . . .").

The nature and circumstances of the offenses, and the need for the sentence to reflect the seriousness of the defendant's crimes, to promote respect for the law, to provide just punishment, to afford specific and general deterrence, to protect the public from further crimes of the defendant,

and to provide the defendant with needed medical, psychological, and correctional treatment, all warrant the Court imposing upward variances on Counts One and Two.

The excerpts from the victim impact statements found in Part III of this Memorandum reflect (i) how scary the defendant's crimes were, (ii) how close the defendant came to a mass-casualty tragedy, and (iii) how the ill effects of the defendant's crimes continue to impact the victims and their daily lives. Additionally, law enforcement's post-arrest interview of the defendant, along with matters submitted by the defendant, show that he suffers from mental illnesses and substance abuse disorders and needs a variety of treatments. PSR ¶¶ 14-18, 94-103. And, as the PSR and the interview of the defendant make clear, the defendant holds a certain set of geopolitical beliefs. PSR ¶¶ 14-15. No one seeks to punish the defendant for any of his beliefs, however, violently acting on those beliefs cannot be tolerated. Our society likely contains others who share the defendant's geopolitical beliefs, and a reasonably long sentence of imprisonment is necessary to deter not just the defendant, but others from attempting to *unlawfully* act on their beliefs by intentionally terrorizing a specific victim or community because of that victim's or community's religious beliefs.

### 4. Forfeiture

In addition to the above, the defendant shall forfeit to the United States all of his right, title and interest of any nature in any and all assets that are subject to forfeiture, as set forth in the Forfeiture Allegation of the Information, pursuant to 18 U.S.C. § 924(d)(1) and 28 U.S.C. § 2461(c). These items include:

    a. A Kel-Tec KS7 12-gauge pump shotgun bearing serial number QLF02.

### III

## GOVERNMENT'S SENTENCING RECOMMENDATION

Based on all of the information before the Court, the government respectfully requests that the Court depart or vary upward and sentence the defendant to (i) concurrent 36-month terms of imprisonment on Counts One and Two; (ii) an 84-month term of imprisonment on Count Three, to run consecutive to the terms of imprisonment on Counts One and Two; and (iii) a five year term of supervised release along with the special conditions recommended by Probation. The 120-month term of imprisonment and 5-year term of supervised release that the government recommends here are sufficient, but not greater than necessary to comply with the sentencing purposes in 18 U.S.C. § 3553(a) for the reasons below.

When determining a reasonable sentence for a defendant, a Court must first consider the applicable Guidelines range. *See Gall v. United States*, 552 U.S. 38, 49 (2007). Although the Guidelines are advisory, they are the "starting point and the initial benchmark" for federal sentencing. *Id.* Once a Court has determined the applicable Guidelines range, it must then consider that range in light of the other relevant § 3553(a) factors. *Id.* at 49–50.

In order to arrive at an appropriate sentence within that range, the Court must consider several factors, including: "(1) the nature and circumstances of the offense . . . ; [and] (2) the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment . . . ; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed . . . medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a). Section 3553(a) then requires the Court to "impose a sentence sufficient, but not greater than necessary, to comply" with these purposes. *Id*.

First, the nature and circumstances of the defendant's conduct are extremely serious. *See* 18 U.S.C. 3553(a)(1). The defendant's crimes began with his unlawful acquisition of the Kel-Tec shotgun. The severity and dangerousness of the defendant's criminal conduct then escalated to his actions on December 7, 2023, which included him approaching the front entrance to Temple Israel armed with his loaded shotgun, and firing two rounds off into the air, all while intending to terrorize those inside of the Temple. PSR ¶¶ 3, 8-40. The defendant picked Temple Israel not because of anything anyone inside the synagogue had allegedly done wrong to the defendant, but simply because many inside of the synagogue were Jewish.

Second, a sentence that includes a total imprisonment term of 120 months (36 months on Counts One & Two and 84 months on Count Three) is not only just punishment, but it reflects the seriousness of the defendant's crimes, and will help promote respect for the rule of law. *See* 18 U.S.C. 3553(a)(2). Many of the victim impact statements express the sheer terror that the defendant inflicted upon those inside of Temple Israel on the afternoon of his heinous crimes.

One mother of a preschool child inside of Temple Israel's Early Child Center writes about the anxiety and terror that she felt:

> My daughter was 3 years old when I received notification that there was an active shooter at her school. It's still impossible to say or write that without crying. My daughter his silently in a darkened classroom for I don't know how long. I will never know how she processed that as a 3-year old. Was she scared and anxious or just bored / confused? I don't and can't know. What I do know is I will never forget the look in the eyes of the TI teachers when I was finally allowed inside to pick her up. *See* Dkt No. 36-1 at pp. 12-13.

One father of a toddler inside of Temple Israel's Early Child Center shared that the experience was terrifying and that the horror remains with him to this day:

14

> I was 10 feet from exiting the building on my way to the parking with my 2-year old son and his friend when this man fired a gun . . . We were then instructed to hide within the building, and I spent the next 75 minutes trying to keep two 2-year-olds occupied in a maintenance closet, reflecting on the life I had lived to that point, and how my wife would manage without me and my son if we were killed. This was a terrifying experience that haunts me to this day. *See* Dkt No. 36-1 at p. 16.

A staff member at Temple Israel's Early Child Center shared that the experience was "forever seared" into her mind:

> As far as I am aware, I was the only person inside Temple Israel to see the defendant outside our building that day with the shotgun. The image of him walking up our front steps and cocking the gun is forever seared into my mind. It is an image that still haunts me to this day and probably forever will. *See* Dkt No. 36-1 at p. 9.

Temple Israel's President summarized the mental and emotional toll that the defendant's crimes caused in those in and around the synagogue:

> I write to express the impact of the violent attack on our synagogue on December 7, 2023. This event, perpetrated by Mufid Fawaz Alkhader, left our community in fear and distress. Dozens of young children and educators in our Early Childhood Center were placed in immediate danger. Parents and staff experienced moments of terror as they were forced to prepare for the worst while their loved ones were on lockdown. *See* Dkt No. 36-1 at pp. 10-11.

Although more than 18 months have passed since the defendant terrorized those inside of Temple Israel on December 7, 2023, the impacts of the defendant's crimes still remain with many of the victims. The timing of the shooting was also exactly two months after Hamas's October 7, 2023 attack on Israel in which over 1,000 Israeli citizens were killed. As can be seen from the victim impact statements that accompany this memorandum, it was a time during which Jewish people everywhere were living in fear of attacks such as this one. And, because of the actions of the defendant, that fear continues to this day for many members of the Temple Israel community.

One Temple Israel member writes about the need for continued security since the attack:

> The terror enacted upon our community by Mufid Fawaz Alkhader in December of 2023 was, unfortunately, not entirely surprising. We have long been unable to gather or pray as Jews without armed security (anywhere in the world). On most Shabbat mornings, we employ a private guard, and a manned police cruiser sits in the corner of our parking lot. To have our worst fears – and the constant threat under which we live – confirmed and fulfilled on that dark day is a nightmare I cannot adequately describe. We are deeply grateful that bloodshed was averted. But the trauma of being targeted in this way is harrowing. *See* Dkt No. 36-1 at pp. 6-7.

Temple Israel's President also shared about the need to safeguard places of worship:

> While a tragedy was thankfully averted, the emotional wounds from that day remain deep. We are a community that thrives on peace and faith, and an attack of this nature strikes at the very heart of who we are. In the face of such fear, however, we found solace in the swift and courageous actions of law enforcement, as well as the incredible resilience of our congregation . . .The sentencing in this case is not merely about punishment but also about safeguarding places of worship and ensuring that all people of faith can live without fear. *See* Dkt No. 36-1 at pp. 10-11.

A staff member at Temple Israel's Early Child Center shared the personal effect that the entire experience has had on her, including suffering from ongoing PTSD symptoms:

> I am the Early Child Center ----------- at Temple Israel and have held this role since before the incident on December 7th, 2023. I have been personally affected; my family has been affected and our Preschool community has been affected by the events that occurred that day. I have personally suffered from PTSD symptoms immediately following the incident and the subsequent 6 months afterwards. My family has worried about my safety going back to work, and as a school, we have had to make many changes in Security measures and procedures, and we lost income due to 3 families that made the decision to pull their children from our program because this incident occurred . . . It was very difficult to go back to work and feel safe for a long time afterwards. I found that I was feeling incredibly stressed all the time. *See* Dkt No. 36-1 at pp. 8-9.

16

A Temple Israel mother also shared the ongoing anxiety that congregants feel because of the attack:

> Temple is meant to be a sanctuary for peace!!! Now, since the hateful events of Mr. Alkhader, my family and I always feel apprehensive visiting our temple, which we had come to think of as our second home. Our agitation begins as we approach the parking lot from New Scotland Avenue and continues as we are greeted and then checked in by a security guard week after week . . . Mr. Alkhader's actions have disrupted our ability to participate in religious practices and community events as a complete family. My youngest boys, ages 13 and 16, are still fearful and anxious. In the early days and weeks, they avoided coming to Temple and any gatherings as a Jewish community such as *Run for Their Lives* and Hanukkah festivities around town. Two of my sons expressed fear and anxiety of copy-cat crimes, even asking us (my husband, myself, and eldest son) not to attend Jewish events, out of fear we may become targets as well. *See* Dkt No. 36-1 at pp. 17-19.

A Temple Israel father likewise shared that the attack continues to impact those in the Temple Israel community:

> The attack wasn't just on a building or community. It was an attack on identity, on belonging, a community where people of multiple faiths and backgrounds come together, and on the sacred space of childhood. The trauma ripples through families, teachers, siblings, and our entire community – and it will take years, if not lifetimes, to repair. *See* Dkt No. 36-1 at p. 20.

Perhaps the best expression of how members of the Temple Israel community continue to live in fear as a result of the defendant's actions comes from another Temple Israel member who says that Temple Israel served as a place of support and refuge following the tragic events of October 7th, but that after the defendant's actions, Temple Israel has lost that feeling of safety and security:

> This is what Temple Israel was to the community following the nightmares of October 7th. A place where nothing had to be said to

>explain our grief.  A place where we could feel safe and secure and unafraid for our Jewish identity and for our lives.  It was a haven from the outside world and a place where we could feel at home and with family even if our family was miles away.  This is also the feeling that was robbed of our community by the actions of Mufid Fawaz Alkhader on December 7, 2023.  **There is absolutely no sense of safety.** [emphasis original].  *See* Dkt No. 36-1 at pp. 4-5.

Third, a sentence that includes lengthy periods of incarceration and post-release supervision will help protect the public from future crimes of the defendant, and will ensure that he receives the correctional and medical treatment he so desperately needs.

Fourth, the victim impact statements detail just how scary and traumatizing December 7, 2023 was for those who worshipped, worked at, or were simply inside of Temple Israel.  The defendant was wrong to blame those associated with Temple Israel for perceived injustices thousands of miles away in the Middle East.  Most importantly, the defendant was wrong to fire off shotgun rounds outside of Temple Israel as part of a calculated effort to scare, intimidate, and threaten innocent people just because of where and how they practice their faith.  The defendant's crimes are very serious and for those crimes the defendant should be punished severely.

To be clear, this was not a crime of opportunity, nor were the defendant's actions a result of, or reaction to, a sudden or unforeseen event.  Instead, the defendant took a series of intentional and deliberate steps to achieve his goal of striking fear into those present at Temple Israel.  Those steps included conspiring with a friend to help him obtain a firearm under false pretenses; identifying a target synagogue; loading the firearm; concealing the firearm in a duffle bag; arranging for an Uber to take him approximately twenty miles from his home to the target location; exiting the Uber and approaching the synagogue on foot; discharging the firearm in the air; attempting to take down an Israeli flag in front of the synagogue; and yelling "Free Palestine".

The defendant's crimes are very serious, and for those crimes the defendant should be punished severely.[3]

Respectfully submitted this 25th day of July, 2025,

JOHN A. SARCONE III
Acting United States Attorney

By: */s/ Richard Belliss & Alexander Wentworth-Ping*
Richard D. Belliss & Alexander Wentworth-Ping
Assistant United States Attorneys
Bar Roll No. 515295 & 701897

HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division, U.S. Department of Justice

*/s/ Trevor Kempner*
Trevor Kempner, California Bar No. 310853
Trial Attorney, Civil Rights Division
U.S. Department of Justice

---

3  The government reserves the right to respond to defense arguments raised for the first time after filing of this memorandum.  Similarly, if the Court is considering a *sua sponte* departure from the applicable sentencing guidelines range on a ground not previously identified by the parties or in the Presentence Investigation Report, the parties are entitled to notice and an opportunity to respond.  *See* Fed R. Crim. P. 32(i)(1)(c), 32 (h).

Further, the United States respectfully requests that the Court provide the parties with any *ex parte* communications received by the Court in connection with sentencing, with the exception of the confidential sentencing recommendations submitted by the United States Probation Office.