UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v.           )<br>)<br>MUFID FAWAZ ALKHADER    )<br>)<br>) | Hon. Anne M. Nardacci<br>U.S. District Court Judge<br>Case No. 1:25-CR-007-001 |

## SENTENCING MEMORANDUM

On December 7, 2023, Mufid Fawaz Alkhader struggled with severe mental illness that had steadily worsened over several years and drastically affected his judgment. His mental illness prompted several emergency medical visits over the years leading to the events in this case, including a medical visit on December 5, 2023 when his treatment provider called for a "crisis evaluation". Mr. Alkhader's mental illness was not adequately treated. In his worsening mental health condition, Mr. Alkhader absorbed information about the ongoing tragedy following the October 7, 2023 Hamas attacks on Israel and the ever-increasing casualties of innocent people in Gaza who share his background. Because of his severe mental illness, he had no rational ability to process that information and certainly no capacity for sound judgment about it.

On December 7, 2023, he traveled from his home in Schenectady to the Temple Israel synagogue with a shotgun he had obtained illegally, walked toward the front of the building, fired two rounds into the air, and attempted to remove the flag of Israel from a flagpole on the front of the property. Thereafter, he relinquished the gun to a bystander and surrendered to Albany police. He waived his rights to silence and counsel, and he spoke freely to Albany

1

police. While inside an Albany Detective Office interview room for approximately seven hours, Mr. Alkhader exhibited alarming behaviors clearly indicative of his severe mental illness.

Mr. Alkhader has been evaluated by a forensic psychologist, who has confirmed Mr. Alkhader's severe mental illness and its effect on his behavior and has opined on Mr. Alkhader's amenability to treatment. Since his arrest, Mr. Alkhader has received effective mental health treatment, which has substantially transformed him. His mental health has improved, and his head is now clear. Mr. Alkhader regrets his conduct and its effect on the community. He understands the seriousness of his conduct and that he must be held accountable with a substantial sentence of imprisonment.

## I.  INTRODUCTION

Mufid Fawaz Alkhader is prepared to be sentenced upon his waiver of indictment and plea of guilty pursuant to a plea agreement to an information charging one count of conspiracy to commit an offense against the United States (false statements to a federally licensed firearms dealer), in violation of 18 U.S.C. §§371 and 922(a)(6), based upon Mr. Alkhader's agreement with another person in early November of 2023 to have that person make false statements to a federally licensed firearms dealer in connection with the purchase of a shotgun for Mr. Alkhader; one count of obstruction of free exercise of religious beliefs, in violation of 18 U.S.C. §247(a)(2) and (d)(3), based upon Mr. Alkhader's conduct on December 7, 2023 of shooting a shotgun into the air outside Temple Israel; and one count of brandishing a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. §924(c)(1)(A)(ii), based upon Mr. Alkhader's possession of a shotgun on December 7, 2023, which he brandished, in furtherance of the obstruction of free exercise of religious beliefs, in violation of 18 U.S.C. §247(a)(2) and (d)(3).

Mr. Alkhader asks the Court to impose a sentence of imprisonment at the low end of the applicable sentencing guidelines range, 102 to 108 months imprisonment, to be followed by a term of supervised release. The enumerated factors under §3553(a) support the imposition of such a sentence. Those factors here include Mr. Alkhader's history and characteristics, including his lack of criminal history, his history of severe mental illness and its contribution to the conduct in this case, and his amenability to effective mental health treatment, which he has received and which has drastically improved his mental health while in pretrial and presentence custody.

## II.     MR. ALKHADER'S POSITION ON THE PSR.

*Factual contents:*

The defense submitted its position regarding the initial draft of the PSR (Dkt No. 31, 3/28/25) by correspondence of May 26, 2025, following the review of an unusually complicated report. The addendum of June 23, 2025 reports on the defense's pursuit of multiple extensions of the time to provide our PSR position. For clarity, those extensions were necessitated by the PSR's inclusion of substantial, important factual information which was not available to the defense prior to the issuance of the PSR, without which the defense could not fully evaluate the PSR.[1]

Regarding the PSR's factual contents, the defense does not seek the adjudication of any factual disputes. Mr. Alkhader asks the Court to view his proffered position, set forth in the

---

[1] The defense understands from candid discussions with the government that law enforcement information-processing and delivery of information to the government continued after Mr. Alkhader's guilty plea. As soon as the government realized the defense had not been provided information that had been given to the Probation Office for the PSR, the government provided that information to the defense. The defense and the government also collaborated thereafter in the review of certain PSR descriptions of law enforcement investigative information that were not readily reconcilable with available records, and the government determined that certain factual revisions in the PSR were required. Mr. Alkhader appreciates the patience of the Probation Office to allow Mr. Alkhader to have adequate time to review the factual contents of the PSR and the government's diligence after the issuance of the initial draft of the PSR to provide the defense with newly developed factual information.

addendum, as clarifying and supplemental to the facts chosen for inclusion in the PSR. For instance, the defense appreciates the difficulty with which the probation office could report fully and accurately regarding a seven-hour recording of a law enforcement interview of a severely mentally ill individual. Mr. Alkhader included in his position the summarization of information and descriptions of several segments of that recording that were not as well described in the PSR, which Mr. Alkhader hopes will assist the Court in fully assessing Mr. Alkhader's mental state and communications with police following his conduct at issue here. Mr. Alkhader asks the Court to consider his other proffered positions on the factual contents in the same manner, as clarifying and supplemental.

*Sentencing guideline computation:*

Mr. Alkhader does not object to the sentencing guidelines computation in the final, revised version of the PSR.

### III. THE COURT SHOULD IMPOSE A SENTENCE OF 102 MONTHS IN LIGHT OF ALL OF THE FACTORS UNDER 18 U.S.C. §3553(a).

#### A. *History and Characteristics of Mufid Fawaz Alkhader.*

Mufid Fawaz Alkhader was born in 1995 in a Palestinian refugee community around Baghdad, Iraq. Mufid's parents, both Palestinian, were raised as stateless people, regularly forcibly displaced from their homes. Mufid is the youngest of four children.

The predominant influences upon Mufid during his upbringing were fear and suffering. His family's living circumstances were perpetually unstable into Mufid's teenage years. With no home country, they had nowhere safe to go, nowhere to call their own. Within the family, Mufid suffered physical and emotional abuse. Mufid was sexually abused by a distant relative at around 8 years old.

Mufid's family eventually was forced to flee Baghdad when the Shiite militia targeted Palestinian refugees and engaged in ethnic cleansing. Mufid's father had been arrested and jailed simply for being Palestinian. Mufid's family had to sell all its valuables to have enough money to pay authorities to release his father. Mufid believes his father was a changed person after that traumatic event. From Mufid's perspective, his father was more angry and more apt to be physically abusive toward Mufid. The family fled ethnic cleansing for Palestinian refugee areas in Syria. Mufid's family was forced to move multiple times to escape unsafe conditions.

Mufid experienced extreme violence inflicted upon the people of his community. He experienced the abduction and murder of people he knew, including family members, and the terror of having to flee the family's home to avoid the same fate.

Mufid's family moved from Baghdad to Palestinian refugee areas in Syria, to refugee areas in Yemen, and back to refugee areas in Syria. Eventually, in 2012 when Mufid was 16 years old, he and his family moved to the United States, entering as refugees. Mufid became a naturalized United States citizen in 2018.

Upon arriving in the United States, Mufid resided for approximately one year in Albany before he and his family moved to Schenectady, where Mufid has resided most of his life since he was about 17 years old. He completed school in Schenectady, ultimately receiving his GED after exceeding the maximum age to continue to attend the public school. Mufid studied for a short time at Schenectady County Community College, where he pursued studies in chemical dependency counseling and criminal justice.

Mufid's employment history has been sporadic. In his late teens, he worked for several months in a college dining hall. In 2019, he worked for a short time as a security guard. Like many individuals in 2020 and 2021, Mufid was unemployed due to the Covid-19 pandemic.

Mufid worked again in the college dining hall for a short time thereafter. He worked for several months as a security guard in 2023.

Mufid was involved in one serious romantic relationship, which occurred over approximately one year between 2021 and 2022. That relationship was turbulent and dysfunctional, culminating with the woman moving to Michigan. From Michigan, she has asserted that Mufid is the father of a child she delivered. She will not allow him to meet and spend time with the child. From afar, her family and acquaintances have tormented Mufid with threats of physical harm. The terribly dysfunctional dynamic around that relationship has had an adverse effect on Mufid's mental health.

Mufid's mental health is the most critical factor affecting sentencing in this case. Mufid began to exhibit signs of mental illness as early as 9 or 10 years old. During the presentence interview, Mufid reported suicide attempts in his younger childhood. Medical records from the past several years reflect a clear deterioration of Mufid's mental health, which appears to have progressed to a psychotic disorder like schizophrenia during the time leading up to the fall and winter of 2023. Excerpts of records from mental health hospitalizations are included herewith as Exhibit 1. Those records reflect the following sequence of treatment events:

> 12/7/17 – Mr. Alkhader was admitted to Ellis Hospital with breathing issues following a verbal and possible physical altercation with his father, who had stabbed Mr. Alkhader in the past. Mr. Alkhader reported "feeling suicidal and handed the ED nurse a knife that he had on his person." Exhibit 1-0001.

> 5/24/21 – Mr. Alkhader was admitted with symptoms of anxiety. Records note that he "has been seen multiple times for anxiety" and was "upset crying unable to sit still in the bed writhing back and forth otherwise in no apparent respiratory distress." Exhibit 1-0008 to 1-0009.

> 7/27/21 – Mr. Alkhader was admitted to Ellis Hospital for physical symptoms "that may be related to anxiety". During that visit, Mr. Alkhader told a treating

nurse that "he is hearing voices telling him to hurt himself."  Records note Mr. Alkhader reported auditory hallucinations.  Exhibit 1-0010 to 1-0013.

11/28/22 – Mr. Alkhader ultimately was admitted as an inpatient, presenting at Ellis Hospital for crisis evaluation, for fighting and exhibiting "paranoid like behavior."  Records reflect, "… people are out to get him and are trying to fight him.  He states he is hearing voices, that are telling him negative ideas about himself.  He states the voices have told him to hurt himself…."  Those records note, "Keeps repeating 'I want to die,' rocking back and forth on the bed."  Records note "he appears to be having psychotic episode and is unstable for discharge at this time."  The records include as a diagnosis, "Unspecified schizophrenia spectrum and other psychotic disorder."  Exhibit 1-0015 to 1-0018.

12/5/23 – Mr. Alkhader was brought to the Family Health Center EHC by his brother and brother-in-law due to erratic behavior.  The records reflect the provider was "concerned for his risk of suicide given his recent episode of overdose with use of unknown drugs, I believe he will benefit from crisis evaluation, pending the need for inpatient hospitalization.  Patient strongly refused to be evaluated in the ED and started to raise his voice when I offered this option.  When I request to speak to his 2 brothers [alone] 2 discussed [sic] importance of urgent evaluation, he did not allow me to speak to his brothers [alone]….  Discussed with patient and his brothers that he should stay with his family due to the mood instability from the complexity of his situation."  Exhibit 1-0034 to 1-0035.

As of December 5, 2023, Mufid's mental health condition appeared to have been at its worst.  In conversations with Mufid's brother, Khalid Alkhader, Khalid reported that he intervened to take Mufid for emergency treatment on December 5, 2023 because Mufid was "acting crazy" and talking to himself.  The observations of Mufid's brother-in-law, Rami Saidam, from December 5, 2023, as Mr. Saidam reported to the FBI, also included highly erratic behavior on Mufid's part.  As reflected in the PSR at ¶38:

> Saidam noted Alkhader seemed physically different that day than how he had remembered him in the past, in that his hands were clenched, his body was stiff, and he was visibly angry. He further recalled Alkhader having recently taken a trip to New York City and had traveled to the city (presumably on a second occasion) ten days prior to purchase drugs. On December 5, 2023, Alkhader

7

informed Saidam that he had taken fifteen pills. Saidam asked him if he was "trying to die," and Alkhader replied, "Yes."

PSR ⁋38.

Before observing the alarming behavior of Mufid that led his brother and brother-in-law to seek urgent mental health treatment and that led a doctor to recommend a "crisis evaluation", Mufid asked his brother-in-law to drive Mufid to the Apple store. Mufid expressed the paranoid belief that his former girlfriend had hacked his phone, had put a tracking device on his phone, and had sent him nude photos of him that had been obtained by hackers. PSR ⁋38.

It is clear that in the first week of December of 2023, in the days and hours approaching December 7, 2023, Mufid was in a mental health crisis and, as recognized by a treatment provider, in need of a crisis evaluation and possible inpatient hospitalization.

  **B.**  ***Nature and Circumstances of the Offense.***

In early November of 2023, Mr. Alkhader asked Andrew Miller to buy a shotgun for Mr. Alkhader at a time when Mr. Alkhader believed he might not be permitted to buy one himself. Andrew Miller agreed. The purchase was made at a federally licensed firearms dealer, where Andrew Miller falsely answered a question about the "actual transferee/buyer" on the Firearms Transaction Record. After the completion of the background check, the purchase was completed on November 6, 2023.

Mr. Alkhader purchased the shotgun to protect himself and his family. The purchase of the shotgun was unrelated to the events that would take place on December 7, 2023.[2] As

---

[2] Should there be a concern that Mr. Alkhader purchased the firearm as part of a long-term plan to be executed on December 7, 2023 because of his perception of events surrounding October 7, 2023 and the war in Gaza, there is evidence to dispel that. Mr. Alkhader had sought to purchase a 12-gauge shotgun in 2021, which, although unsuccessful, obviously was unrelated to how he might have perceived events after October 7, 2023.

mentioned above, Mr. Alkhader suffered from mental illness that, among other things, made him paranoid and frightened that others sought to harm him.  Separately, it appears he actually was the target of threats on his life and/or his family's lives.  As he explained during the law enforcement interview of December 7, 2023, after the relationship with his girlfriend ended, her family members and others associated with her made threats against Mr. Alkhader and his family.  Mr. Alkhader informed law enforcement agents that a person named Moyed[3] threatened to kill Mr. Alkhader's mother.  PSR ¶16.  As Mr. Alkhader told Andrew Miller, the shotgun was for protection.

The plea agreement accurately describes Mr. Alkhader's offense conduct surrounding the events of December 7, 2023.  Mr. Alkhader takes no issue with the characterization of his actions in the plea agreement.  At the same time, the plea agreement does not clearly reflect the influences upon Mr. Alkhader that led to his extraordinarily misguided actions.  The driving force behind Mr. Alkhader's conduct was severe, untreated mental illness, without which Mr. Alkhader would not have committed those actions.

The law enforcement interview of Mr. Alkhader is most revealing.  During Mr. Alkhader's presence in the interview room over approximately seven hours, while having no reason to know the room was being recorded, he exhibited the following significant behaviors consistent with severe mental illness (with times referencing the running time of the digital recording named by the government, USA_ALKHADER-00000256.mp4[4]):

---

[3] As discussed in the addendum, the PSR at ¶16 incorrectly quotes Mr. Alkhader during the law enforcement interview as saying "Wahid" instead of "Moyed" when naming that person.
[4] The defense does not believe the government would dispute the description of events here.  Nevertheless, the defense will provide the recording to the Court should the government raise any dispute and/or should the Court wish to review it.

4:30 – soon after Mr. Alkhader is brought into the interview room and left alone, he talks to himself over the course of several minutes, at one point pressing his face against the wall as he talks to himself.

11:20 – Mr. Alkhader, alone in the room, lays on the floor and appears to be in distress, moaning, grunting, talking to himself, exhibiting behavior that is concerning enough for a police official to check on him. Mr. Alkhader spoke to the officer about his body being in pain and stating that he doesn't want to die.

18:30 – Mr. Alkhader, alone in the room, pulls his shirt over his head, rocking, tapping his feet repetitively and talking to himself for minutes and the begins to hit himself in the head with his fists before a police official enters.

46:45 – Mr. Alkhader, alone in the room, is laying on the floor moaning.

1:31:45 – Mr. Alkhader, alone in the room, sways back and forth, the begins moaning continuously and increasing in volume over the next five minutes until a police official enters the room.

At 2:33, over the next hour-plus, Mr. Alkhader exhibits behaviors indicative of severe mental illness, including hitting himself in the head with his fists, moaning, panting, groaning, apparently crying and swaying while gripping his arms around his head, groaning and yelling loudly, apparently sobbing; announcing "I need help" repeatedly; talking and yelling to himself; appearing to try to hurt himself and choke himself with a chair. When a police officer enters to remove the chair, Mr. Alkhader talks about the voices in his head. The officer leaves, and Mr. Alkhader writhes in apparent pain, gripping his head, yelling out. Mr. Alkhader slams his head against the wall repeatedly while yelling out and crying.

At 4:42:20, Mr. Alkhader, in the room alone, slams his head against the wall with great force four times.

Considering Mr. Alkhader's worsening mental health condition leading to the unsuccessful medical intervention of December 5, 2023, and the obvious distress exhibited by him while present in the police interview room, there is no basis to dispute that Mr. Alkhader's actions were affected by his severe mental illness more than any other factor.

Considering Mr. Alkhader's upbringing described above, particularly his life experience as a Palestinian refugee, it would be unsurprising that he was affected in a significant way in late 2023 by the daily horrors inflicted upon innocent individuals in Gaza following the horrors

10

inflicted on Israelis on October 7, 2023.  It also appears that he was tormented by individuals online in a manner that might have sought to instigate his actions.  But neither of those things would have led him to act if his mental illness had not so diminished his capacity to engage in rational thought and to exercise rational judgment.

        C.        ***Evaluation of Dr. Kimberly Brayton.***

Mr. Alkhader submitted to a forensic psychological evaluation by Kimberly Brayton, J.D., Ph.D.  Dr. Brayton's report of her evaluation of Mr. Alkhader is attached hereto as Exhibit 2.

Dr. Brayton conducted a comprehensive interview of Mr. Alkhader over two days in July of 2024.  She examined his family history, including his history of trauma.  She detailed Mr. Alkhader's history of substance use and abuse.  She interviewed Mr. Alkhader's brother, Khalid, as a collateral source.  Dr. Brayton conducted an examination of all available medical and mental health records.  She also reviewed and considered the recorded law enforcement interview of Mr. Alkhader in this case.

Dr. Brayton used and attempted to use psychological instruments, including the MMPI-2, the widely used personality inventory.  Considering her clinical assessment of Mr. Alkhader, including her examination of his history and present circumstances, the MMPI-2 profile of Mr. Alkhader indicated a reporting pattern of a severe psychotic disorder.

Dr. Brayton sought to administer the Structured Interview of Reported Symptoms (SIRS) to assess the symptoms exhibited by the MMPI-2, but she determined that Mr. Alkhader then was presenting with active psychotic symptoms, rendering the SIRS instrument inappropriate.

Dr. Brayton remarked about Mr. Alkhader's outspokenness about knowing "there is 'something wrong' with his mind and that he needs help"; that "he appreciates the need to receive treatment and has actively sought it out on a number of occasions."

Dr. Brayton opined that Mr. Alkhader has symptoms consistent with severe mental illness, that he "has a mood and cognitive-based disorder, likely Schizoaffective Disorder," along with "an anxiety-based disorder such as panic disorder." She explained that "[t]aken together, these conditions are likely to result in cognitive and behavioral symptoms that are paranoid, delusional erratic, and exhibiting very poor judgment." She noted that those symptoms would only be worsened by the use of drugs and head injuries.

Dr. Brayton further opined that Mr. Alkhader, who "strongly needs mental health treatment," is at a moderate level of risk for future violence if his mental illness is not managed. Dr. Brayton observed that Mr. Alkhader "demonstrates insight and a present willingness to accept treatment which also stands to improve his level of risk."

The findings and opinions of Dr. Brayton support the conclusion that Mr. Alkhader's actions in this case—while exhibiting symptoms that are "paranoid, delusional erratic, and exhibiting very poor judgment"—were affected by his severe mental illness. It stands to reason that, without that severe mental illness, he likely would not have committed those actions.

### D. *Mr. Alkhader's improved mental health through treatment.*

Since his arrest and placement in the Albany County Jail, Mr. Alkhader has received effective mental health treatment that has transformed him into a clear-headed, well-functioning individual. Defense counsel has observed the steady and obvious transformation of Mr. Alkhader from a person with poor insight and disorganized thinking to a much more stable and insightful person with a rational view of his circumstances.

The most recent mental health evaluation report from the Albany County Jail Mental Health Unit (4/30/25), attached as Exhibit 3, reflects that Mr. Alkhader's mood was good, that his anxiety level is low, that he did not have any recent panic attacks, that although he reported a "medium" level of depression, he had no feelings of hopelessness or helplessness, and the he is "looking forward to 'getting better in life.'"

Importantly, that report reflects that Mr. Alkhader remains compliant with his medications, which include antipsychotic medications that appear to have worked well for Mr. Alkhader.

As written in the PSR about Mufid, "Since his incarceration, he has been taking prescribed medications for his mental health conditions and has exhibited a notable improvement in his thoughts and behavior. His medication regimen has also allowed him to control his anger and understand the consequences of his behavior." PSR ¶48. Consistent with that observation, during the presentence interview, the interviewer remarked that having seen the video of the police interview, Mufid did not look like the same person who was interviewed by police.

### E. *Mr. Alkhader's sentencing statement.*

Mr. Alkhader submits herewith a statement to the Court that explains how he feels about his conduct, what has happened since, and what will happen in the future.

Mr. Alkhader, who is able to think so much more clearly now, understands how diminished he was by his untreated mental illness, and how that allowed him to engage in such destructive thinking. He wishes he had submitted to much needed mental health sooner, which likely could have prevented his actions in this case.

Mr. Alkhader sees a silver lining for him in the effective mental health treatment he has received in the Albany County Jail. He appreciates the need going forward to be disciplined in treating his mental health.

Mr. Alkhader fully accepts responsibility for his actions. He fully understands the seriousness of his conduct and its effects, especially the fear he instilled in the Temple Israel community and the surrounding community. As a person whose formative years were so frightening, he regrets that he has made anyone feel afraid. He seeks forgiveness and is committed to being a better person.

### F.    *Sentencing recommendation.*

The Court should impose a sentence at the low end of the applicable sentencing guidelines.

Mr. Alkhader's severe mental illness is a factor that otherwise likely would warrant a downward departure or variance in this case. Since 2010, the Sentencing Guidelines have permitted consideration of extraordinary mental health conditions as a basis for a departure from the applicable guidelines:

> Mental and emotional conditions may be relevant in determining whether a departure is warranted, if such conditions, individually or in combination with other offender characteristics, are present to an unusual degree and distinguish the case from the typical cases covered by the guidelines.

U.S.S.G. §5H1.3 (amend. 739).

In Mr. Alkhader's case, there is no question that his severe mental illness constitutes a "condition[]… present to an unusual degree," distinguishing his case from the typical case. Whether sufficient to warrant a downward departure, Mr. Alkhader's mental health condition certainly would support a variance under most circumstances.

That said, Mr. Alkhader appreciates the seriousness of his conduct in this case and its effect on the Temple Israel community and the broader community. Whereas a mental illness of the nature and degree as present here normally would warrant a downward departure or variance, considering countervailing factors here such as the psychological injuries to victims or charges not pursued, Mr. Alkhader's severe mental illness should support a guideline sentence.

When Mr. Alkhader would not have committed the offense in this case if not for his severe mental illness, the purposes to be served by upward departures that might be advocated by the government are not served. Mr. Alkhader, when moved by mental illness which he had little capacity to control, simply is not more culpable and deserving of more severe punishment, as contemplated by the government's upward departure arguments, the same way a person without such a mental illness might be.

Under the unique circumstances of this case, a sentence of 102 months imprisonment, to be followed by a term of supervised release, would be sufficient to serve the purposes of sentencing.

**CONCLUSION**

Based on the foregoing, Mr. Alkhader respectfully asks the Court to impose a sentence of 102 months imprisonment, to be followed by a term of supervised release.

Date: July 25, 2025                                 LISA PEEBLES
                                                    Federal Public Defender


                                    By:    /s/Timothy E. Austin
                                           Timothy E. Austin
                                           Bar Roll No. 508098
                                           Assistant Federal Public Defender
                                           54 State Street, Suite 310
                                           Albany, New York 12207
                                           Tel: (518) 436-1850
                                           Fax: (518) 436-1780

Email: tim_austin@fd.org

To: United States District Court Clerk
Richard D. Belliss, Esq., AUSA
Alexander P. Wentworth-Ping, AUSA
Angela Bennett, Sr. USPO

## CERTIFICATE OF SERVICE

I, Timothy E. Austin, Esq., hereby certify that on July 25, 2025, I filed the foregoing Sentencing Memorandum, with exhibits, by ECF, which sent notification to

    AUSAs Richard D. Belliss and Alexander P. Wentworth-Ping

and I served the same upon Trevor Kempner, Trial Attorney, Civil Rights Division, U.S. Department of Justice, by email and upon Sr. USPO Angela Bennett by email.

                                                        LISA PEEBLES
                                                        Federal Public Defender

By:    */s/Timothy E. Austin*
          Timothy E. Austin
          Bar Roll No. 508098
          Assistant Federal Public Defender
          54 State Street, Suite 310
          Albany, New York 12207
          Tel: (518) 436-1850
          Fax: (518) 436-1780
          Email: tim_austin@fd.org